*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0065p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WOMEN'S MEDICAL PROFESSIONAL CORPORATION;
MARTIN HASKELL, M.D.,

        *Plaintiffs-Appellees,*

        *v.*

J. NICK BAIRD, M.D., Director of Ohio Department
of Health,

        *Defendant-Appellant.*

Nos. 03-4249; 04-3060

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00162—Algenon L. Marbley, District Judge.

Argued and Submitted: February 3, 2005

Decided and Filed: February 17, 2006

Before: GIBBONS and SUTTON, Circuit Judges; EDGAR, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Diane R. Brey, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Alphonse A. Gerhardstein, LAUFMAN & GERHARDSTEIN, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Diane R. Brey, Douglas R. Cole, Stephen P. Carney, Dennis G. Nealon, Winston M. Ford, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Alphonse A. Gerhardstein, Jennifer L. Branch, LAUFMAN & GERHARDSTEIN, Cincinnati, Ohio, David C. Greer, BIESER, GREER & LANDIS, Dayton, Ohio, for Appellees.

        GIBBONS, J., delivered the opinion of the court, in which EDGAR, D. J., joined. SUTTON, J. (pp. 18-21), delivered a separate opinion concurring in part and dissenting in part.

_____

### OPINION

_____

        JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-appellee Women's Medical Professional Corporation ("WMPC") operates an abortion clinic in Dayton, Ohio. Under Ohio law, the Dayton clinic is required to be licensed. The clinic attempted to enter into a written transfer agreement with

_____

[*]The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee, sitting by designation.

a Dayton-area hospital in order to meet the requirements necessary to obtain a license. No hospital would enter into a transfer agreement with the clinic. WMPC therefore sought a waiver of the transfer agreement requirement; in its application, it stated that it had a back-up group of physicians that would provide care in the event of an emergency, and it also provided a letter from Miami Valley Hospital, stating that the hospital would accept patients in the event of an emergency. Defendant-appellant Director J. Nick Baird, M.D., of the Ohio Department of Health ("ODH") denied WMPC's request for a waiver, proposed to issue an order denying its license application, and issued a cease-and-desist order requiring the clinic to close immediately. WMPC filed a complaint in the United States District Court for the Southern District of Ohio seeking a temporary restraining order ("TRO") and injunction against enforcement of the cease-and-desist order. WMPC argued that the written transfer agreement requirement was unconstitutional as applied to the Dayton clinic. United States District Judge Susan J. Dlott granted the TRO. The case was then transferred to United States District Judge Algenon Marbley. Judge Marbley conducted a nonjury trial and granted WMPC's motion for a permanent injunction, preventing Director Baird from enforcing the written transfer agreement requirement against the Dayton clinic. He also awarded WMPC attorneys' fees and expenses.

Director Baird now appeals the district court's grant of a permanent injunction and award of attorneys' fees and expenses. For the following reasons, we affirm the district court with respect to its conclusion that WMPC's procedural due process rights were violated, but vacate the grant of a permanent injunction and remand the case for a hearing on the proposed denial of the license application. We affirm the award of attorneys' fees and expenses.

I.

Under Ohio law, ambulatory surgical facilities ("ASF") must be licensed.[1] Ohio Rev. Code § 3702.30(E)(1). ODH regulates ASFs. Its director is authorized to establish quality standards. *Id.* § 3702.30(B). As part of these quality standards, the director promulgated a requirement that ASFs have a written transfer agreement with a local hospital. Ohio Admin. Code § 3701-83-19(E). The transfer agreement requirement ensures that the ASF can transfer patients "in the event of medical complications, emergency situations, and for other needs as they arise." *Id.*

In order to obtain a license, an ASF must meet the licensing requirements or apply for a waiver or variance of the requirement. The director can grant a waiver only if "the director determines that the strict application of the license requirement would cause an undue hardship to the [health care facility] and that granting the waiver would not jeopardize the health and safety of any patient." Ohio Admin. Code § 3701-83-14(B)(2). The director can approve a variance if "the director determines that the requirement has been met in an alternative manner." *Id.* § 3701-83-14(B)(1). It is solely within the director's discretion as to whether a variance or waiver should be granted. *Id.* § 3701-83-14(D). The director's refusal to grant a variance or waiver does not create any rights to a hearing under Ohio law. *Id.* § 3701-83-14(E).

WMPC is owned by Dr. Martin Haskell. WMPC operates abortion clinics in Dayton (the subject of this lawsuit), Cincinnati, and Indianapolis. Dr. Haskell performs abortions at all three clinics.

The Dayton clinic is approximately forty-five to fifty-five miles away from the next closest abortion clinic in Cincinnati. It is also the only clinic in southern Ohio providing abortion services

---

[1]ASFs are free-standing facilities where outpatient surgery is routinely performed. Ohio Rev. Code § 3702.30(A)(1). ASFs include facilities providing medical care and services in areas including, but not limited to, cosmetic and laser surgery, plastic surgery, abortion, dermatology, digestive endoscopy, gastroenterology, lithotripsy, urology, and orthopedics.

up to twenty-four weeks. According to Dr. Haskell, he is the "only provider in southern Ohio that goes past 18 or 19 weeks through the 24th week of pregnancy." Evidence in the record suggests that the only other clinics in Ohio also offering late second trimester abortions are located in Cleveland.

The Dayton clinic opened in 1983. It was not required to have an ASF license for many years; after the ASF licensure requirements were enacted, it operated without a license. In 1999, the director of ODH visited this clinic and advised that it must apply for a license. Along with other facilities, the Dayton clinic argued that it was not an ASF; however, an Ohio court ruled that it was an ASF. *Founder's Women's Health Ctr. v. Ohio State Dep't of Health*, Nos. 01AP-872, 01AP-873, 2002 WL 1933886 (Ohio Ct. App. Aug. 15, 2002).

In October 2002, the Dayton clinic applied for a license.[2] In order to meet the transfer agreement requirement, it asked two Dayton hospitals to sign such an agreement. Grandview Hospital declined. Miami Valley Hospital initially agreed to enter into a transfer agreement. However, on November 19, 2002, it notified Dr. Haskell that it would be terminating the agreement within thirty days.[3]

Unable to find another hospital that would enter into a written transfer agreement, WMPC requested a waiver of this requirement for the Dayton clinic on December 20, 2002. In support of the waiver application, WMPC included a letter from Miami Valley Hospital, which stated that "the Miami Valley Hospital Emergency and Trauma Center will be available to any of your patients that have an emergency medical condition." WMPC also stated that it had an oral agreement with an unnamed, five-member obstetrics and gynecology group to provide back-up care.[4] WMPC did not name the physicians associated with the group in its waiver request because the group requested that its identity and association with the abortion clinic be kept confidential for security reasons. WMPC concluded its waiver request with a statement offering to provide ODH with further information if needed.

During the time that WMPC was seeking a license, the Ohio governor's office, ODH, and Director Baird received numerous letters urging Director Baird to close the Dayton clinic. Approximately 378 letters asked ODH to close the clinic, 365 letters asked ODH not to grant a waiver, and 300 letters asked ODH to "enforce the law against Dr. Haskell." Director Baird also received letters from the Mayor of the City of Kettering, where the clinic is located, and State Senator Jim Jordan asking him to deny the waiver application. The Mayor of the City of Kettering wrote a letter to Director Baird, stating that "Kettering is not proud to be the location of an acknowledged 'late-term abortion' clinic" and asking Director Baird to "enforce the state law" and have the "Ohio Department of health [sic] . . . be our protectors." Senator Jordan's letter asked Director Baird to "grant no exceptions or waivers to the center, especially in regards to the transfer agreement." Director Baird responded to Senator Jordan in a letter stating that "we have confirmed that the transfer agreement was rescinded by the hospital effective December 20th . . . and are conferring with legal counsel to determine the options available to us subsequent to December 20th."

---

[2] At this same time, WMPC's Cincinnati clinic applied for a license. It met all the requirements for licensure and was duly licensed on December 6, 2002.

[3] Dr. William Stalter, a pro-life advocate and member of the Board of Trustees of Miami Valley, objected to the written transfer agreement. He called the head of Premier Health Care, the owner of Miami Valley, to voice his concerns. Within four days, Miami Valley rescinded its written transfer agreement with the Dayton clinic, offering no explanation for its decision.

[4] This original group withdrew from its agreement with Dr. Haskell during the pendency of this litigation and was replaced by another group.

Also during this time period, Jodi Govern, Chief Counsel for ODH, communicated on a regular basis with representatives of right-to-life groups regarding the status of the license application. Before Miami Valley rescinded its transfer agreement, Govern communicated with a member of Ohio Right to Life to tell her of two deficiencies in the Dayton clinic's application. She told the Ohio Right to Life member that she "would appreciate it if [she] could share this information with [her] colleagues in Dayton." After Miami Valley rescinded the transfer agreement, representatives of Dayton Right to Life and Ohio Right to Life asked Govern for another update. Govern responded that the agreement would no longer be in effect after December 20, 2002 and that "[w]e are exploring options that we can exercise subsequent to that date, and will keep you appraised." A Dayton Right to Life member then asked for more detailed information on what could be expected. Govern e-mailed her and the Ohio Right to Life representative stating that "we have no intention of letting this drag out."[5]

On January 9, 2003, Director Baird denied the waiver request, citing the lack of a written transfer agreement. In a letter, he stated, "It is my belief that the tacit agreement made between the Women's Medical Center Medical Director and unnamed members of an area Obstetrics-Gynecology practice is not a sufficient protection" for patients. That same day, Director Baird ordered Dr. Haskell to cease operating the Dayton clinic.

WMPC filed suit against Director Baird on January 9, 2003, challenging the proposed denial of the ASF license. It also challenged the constitutionality of Ohio Administrative Code § 3701-83-19(E) (the transfer agreement requirement) as applied to its license application. WMPC sought a temporary restraining order and injunction against enforcement of the order to cease operations and against the enforcement of the transfer agreement requirement. It also sought a permanent injunction.

United States District Judge Susan J. Dlott entered a TRO on January 9, 2003. The parties later agreed to an extension of the TRO for an additional ten days. On February 12, 2003, the parties agreed to consolidate the hearing on the request for the preliminary injunction with a trial on the merits. The case was then transferred to United States District Judge Algenon Marbley, who held a bench trial to evaluate the propriety of a permanent injunction.

At trial, Dr. Haskell testified that he performs 3,000 abortions per year at the clinic. No other facility or hospital in Dayton performs elective abortions. The vast majority of patients using the Dayton clinic come from within a fifty to sixty mile radius of the Dayton area.

Dr. Haskell testified that, in his experience, patients rarely need to be hospitalized. If they do need to be hospitalized, it is usually for problems that "are not truly immediately life-threatening" but require observation and care in a hospital. Approximately once every two years, a patient at either the Cincinnati or Dayton clinic needs an urgent transfer to the hospital. Only on one or two occasions in twenty-five years did the clinic need to call 911 for an immediate hospital transfer, because the patient was suffering life-threatening complications. Not once have patients requiring medical attention been denied admission to Dayton hospitals.

Dr. Haskell further testified that his clinic has a written protocol that the staff follows in medical emergencies. The clinic also has a back-up medical group that its staff can call for assistance and to ensure a transfer to a local emergency room. The clinic has used the back-up group approximately four times over the last twenty years.

A Miami Valley emergency room physician testified that the Miami Valley emergency room would triage, screen, and stabilize any patient presenting at its hospital, including WMPC's patients.

---

[5]Govern later sent e-mails to these groups updating them on litigation filed in the district court in this case.

Another physician testified that he was not personally aware of a single instance in which the presence of a transfer agreement made a difference in the care a patient received. Expert witnesses agreed that written transfer agreements do not ensure optimum patient care.

There was also testimony presented regarding WMPC's application for a waiver with the ODH. Dr. Haskell's attorney sent the waiver request to ODH and asked ODH to contact her for "any further information" that it might need. ODH never sought additional information from WMPC nor indicated that information in support of the waiver application was inadequate. Russ Roeder, acting Chief of the Bureau of Regulatory Compliance at ODH, testified that, although he was usually involved with waiver applications, he had no role in reviewing or recommending an outcome with regard to the Dayton clinic application. Rather, WMPC's application was routed through Jodi Govern, Chief Counsel for ODH, because (ODH claimed) the application cited case law.

Director Baird testified that the numerous communications he received from people urging him to close the clinic did not influence his decision to deny the waiver. Rather, he denied the waiver because he did not feel that he had the proper documentation to grant a waiver. He stated that he needed information about the names of the back-up physicians, their credentials, and admitting privileges at Dayton hospitals in order to grant a waiver.

The district court also had evidence before it that Director Baird had granted waivers and variances to abortion clinics in the past. He granted a variance from the transfer agreement requirement to a now-defunct Dayton abortion clinic based on the fact that a "staff physician has admitting privileges at Miami Valley Hospital." He granted a variance to a Cincinnati clinic based on "admitting privileges by the facility medical director at a hospital in Hamilton [C]ounty." He also granted variances to abortion clinics in Columbus and Akron.

After the bench trial concluded, Judge Marbley granted the plaintiffs' motion for a permanent injunction. He concluded the following: (1) the denial of the ASF license would cause irreparable injury to Dr. Haskell due to a loss of business; (2) the denial of the license and waiver and the order requiring WMPC to close would cause irreparable injury to women in Dayton who seek abortions; (3) the written transfer agreement creates "an undue burden and a substantial obstacle for women seeking abortions"; and (4) the requirements as applied violate plaintiffs' right to procedural due process. As a result of Judge Marbley's ruling, ODH was permanently enjoined from enforcing the written transfer agreement requirement with regard to the Dayton clinic.

Director Baird filed a timely notice of appeal.

## II.

A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer "continuing irreparable injury" for which there is no adequate remedy at law. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998). In evaluating a district court's grant of a permanent injunction, this court reviews its factual findings under a clearly erroneous standard and its legal conclusions *de novo*. *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004). The scope of injunctive relief is reviewed under an abuse of discretion standard. *Id.*

Director Baird appeals the district court's determination that WMPC and Dr. Haskell suffered a constitutional violation. He does not challenge the district court's conclusion that the plaintiffs will suffer irreparable harm if the injunction is not granted.

III.

The fundamental right to privacy contained in the Due Process Clause of the Fourteenth Amendment includes the right to choose to have an abortion, subject to certain limitations. *See Roe v. Wade*, 410 U.S. 113, 153 (1973); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 869 (1992)*. Casey* confirmed that a woman has the right to choose to have an abortion prior to viability and to obtain an abortion without "undue interference from the State." 505 U.S. at 846. It also underscored the state's power to restrict abortions after fetal viability and the state's "legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus." *Id.*

The plurality in *Casey* set forth the undue burden analysis for evaluating regulation of pre-viability abortions. *Id.* at 876. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. As relevant to this case, "[r]egulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden." *Id.* at 878. However, "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.*

On appeal, Director Baird argues that the district court should not have applied *Casey* when it evaluated the transfer agreement requirement, because the regulation is one of general applicability and is not abortion-specific. He further contends that the district court erred in concluding that the transfer agreement requirement as applied to the Dayton clinic creates an undue burden on women seeking abortions. We evaluate each of these arguments in turn.

A.

Director Baird argues that *Casey*'s undue burden framework should not apply to this case, because "this is not an abortion case[, but] . . . an as-applied challenge to a neutral regulation of general applicability." Further, Director Baird argues that *Casey* is only applicable to facial challenges to abortion regulations. He contends that because the Ohio regulation is neutral towards abortion, rational or intermediate basis review should apply.

It is true that this court's cases applying *Casey* have done so in the context of abortion-specific laws. *See, e.g.*, *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436 (6th Cir. 2003) (Ohio statute regulating partial birth abortions); *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456 (6th Cir. 1999) (Tennessee law requiring parental notification); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997) (ban on post-viability abortions and "dilation and extraction" abortions). However, "the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation," *Voinovich*, 130 F.3d at 193, and therefore, we must consider the context in which the challenge to the regulation arises.

The generally applicable and neutral regulation in this case (the transfer agreement requirement) affects an abortion clinic, which is unable to satisfy the regulation's requirements. Therefore, *Casey* and other relevant case law regarding state restrictions on abortion apply. *See Planned Parenthood of Greater Iowa, Inc. v. Atchison*, 126 F.3d 1042, 1048-49 (8th Cir. 1997) (applying *Casey* to evaluate state's requirement that an abortion clinic undergo certificate of need review process pursuant to a generally applicable Iowa law); *see also Birth Control Ctrs., Inc. v. Reizen*, 743 F.2d 352, 361-62 (6th Cir. 1984) (observing that Michigan regulation applies to "all freestanding surgical outpatient facilities" and applying governing, pre-*Casey* Supreme Court law on abortions to determine if the regulations impact a woman's right to choose an abortion).

Accordingly, we evaluate the written transfer agreement requirement as applied to the Dayton clinic under the undue burden framework enunciated in *Casey*.

B.

Director Baird next challenges the district court's conclusion that the transfer agreement requirement creates an undue burden for women in the Dayton area seeking abortions. A regulation creates an undue burden when it places a "substantial obstacle" in the path of a woman seeking an abortion. As the *Casey* plurality recognized:

> Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where the state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

505 U.S. at 874.

The district court found that the written transfer agreement requirement as applied to the Dayton clinic "creates a substantial obstacle to the ability of women in the Dayton area to choose an abortion . . . [because it] would serve to shut down completely Dr. Haskell's Dayton clinic, which serves 3,000 women each year."

On appeal, both sides point to evidence in the record supporting their argument as to why the transfer agreement requirement as applied does or does not constitute an undue burden. WMPC contends that 3,000 women per year have abortions at the clinic and that each of these patients will be "without a local abortion provider if the cease and desist order becomes effective." It also argues that for those women who seek late second trimester services, there may be no alternative facility, because the Dayton clinic is the only facility offering these services in southern Ohio. Director Baird contends that no undue burden exists because "the undisputed record evidence shows a dozen other abortion facilities in Ohio, five within 85 miles of the Dayton clinic[,] . . . includ[ing] WMPC's own Cincinnati clinic, located 55 miles away."

A central issue in this case is thus whether the closing of an abortion clinic, requiring its approximately 3,000 patients per year to travel to another clinic for abortion services, constitutes an undue burden on a woman's right to choose to have an abortion. In order to be an undue burden, the closing of the Dayton clinic for failure to obtain a transfer agreement must place a substantial obstacle before women seeking abortions.

Very few courts have addressed whether requiring women to travel further for an abortion constitutes an undue burden. The Fourth Circuit, in ruling that the costs incurred by abortion clinics in complying with a South Carolina regulation did not constitute an undue burden, observed that even though a clinic in Beaufort might have to close, "no evidence suggests that women in Beaufort could not go to the clinic in Charleston, some 70 miles away." *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 170 (4th Cir. 2000). Similarly, the Eighth Circuit suggested that long distances did not constitute an undue burden in evaluating the constitutionality of requiring abortion providers to give certain information to patients twenty-four hours before obtaining an abortion. *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526 (8th Cir. 1994). It stated, "Although the distance a woman must travel to obtain an abortion may be a factor in obtaining an abortion, it is not a result of the state regulation. We do not believe a telephone call and a single trip, whatever the distance to the medical facility, create an undue burden." *Id.* at 533. However, the Supreme Court in *Mazurek v. Armstrong*

intimated that the distance a woman must travel to obtain an abortion factors into the analysis of whether a law imposes a undue burden on a woman's right to choose an abortion. 520 U.S. 968, 974 (1997). In holding that a Montana law prohibiting non-physicians from performing abortions was constitutional, the Court bolstered its conclusion by noting that "no woman seeking an abortion would be required by the new law to travel to a different facility than was previously available." *Id.*

Thus, the binding and persuasive authority of other courts does not firmly establish when distance becomes an undue burden on a woman's right to choose to have an abortion. *Casey* instructs that "[t]he fact that a law . . . has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." 505 U.S. at 874. *Casey* found that a 24-hour waiting period did not constitute a substantial obstacle, even though it would be "particularly burdensome" for "women who have the fewest financial resources, [or] those who must travel long distances." *Id.* at 886. Under *Casey*, "[a] particular burden is not of necessity a substantial obstacle." *Id.* at 887.

We conclude that, while closing the Dayton clinic may be burdensome for some of its potential patients, the fact that these women may have to travel farther to obtain an abortion does not constitute a substantial obstacle. *See id.* at 874 (stating that an "incidental effect of making it more difficult or more expensive to procure an abortion" is not an undue burden). Evidence in the record establishes that there are abortion clinics in Cincinnati, Columbus, Cleveland, and Akron. WMPC itself operates an abortion clinic in Cincinnati, which is approximately forty-five to fifty-five miles from the Dayton clinic. Thus, potential patients of the Dayton clinic could still obtain an abortion in Ohio and, more significantly, could obtain an abortion at a WMPC-owned clinic within a reasonable distance from the Dayton clinic. Based on these facts, we cannot say that closing the Dayton clinic constitutes an undue burden on a woman's right to choose to have an abortion simply because potential patients might have to travel somewhat farther to obtain an abortion. Like the waiting period requirement at issue in *Casey*, the fact that women may have to travel farther to obtain abortion services may be burdensome but it is not a substantial obstacle. *Id.* at 886-87.

The district court also rested its decision that application of the transfer agreement requirement to the Dayton clinic is an undue burden on the fact that the regulation would serve to shut down a clinic that serves 3,000 women per year. However, the fact that the clinic serves 3,000 women per year is insufficient in and of itself to establish that applying the transfer agreement requirement to the clinic constitutes an undue burden. Ninety percent of those women come from within fifty to sixty miles of Dayton.[6] However, there is no evidence suggesting that a large fraction of these women would be unable to travel to other Ohio cities for an abortion.[7] There is also no evidence in the record showing that closing the Dayton clinic would operate as a substantial obstacle in choosing to have an abortion for a majority of these women. Thus, although denial of the ASF license would serve to close a clinic that provided abortions to 3,000 women per year, there is no indication that the closing of the clinic would create a substantial obstacle for Dayton-area women seeking an abortion in light of the availability of another clinic less than fifty-five miles away from the Dayton clinic.

---

[6] The other ten percent of patients come from across Ohio and from other states. Presumably, the closing of the Dayton clinic would not impose an undue burden on this population because they already are traveling to seek abortion services.

[7] WMPC points to evidence in the record that very few of the Cincinnati clinic's patients come from Montgomery County, where Dayton is located. This fact, however, does not establish that Dayton-area patients would not travel to the Cincinnati clinic or other clinics if the Dayton clinic closed. Rather, it only tends to establish that Dayton-area women prefer to use the abortion clinic located in their community.

WMPC also argues that application of the transfer agreement requirement to the Dayton clinic operates to close the only clinic in southern Ohio offering abortions after the eighteenth or nineteenth week of pregnancy. While Dr. Haskell admitted that theoretically he could perform these abortions at his Cincinnati clinic, he stated that "[i]n practical terms it would be difficult." Director Baird's denial of the waiver application and license could eliminate the possibility that women in southern Ohio could obtain an abortion in the late second trimester.

In *Voinovich*, this court held that an Ohio statute that banned the D & E abortion procedure, the most commonly used abortion procedure in the second trimester, constituted an undue burden on a woman's right to choose. 130 F.3d at 201. The court stated, "An abortion regulation that inhibits the vast majority of second trimester abortions would clearly have the effect of placing a substantial obstacle in the path of a woman" wanting an abortion. *Id.* Similarly, in this case, ODH's action in applying the transfer agreement requirement to the Dayton clinic effectively prevents women who are over eighteen weeks pregnant from obtaining an abortion in southern Ohio. These women would face difficulties in choosing to have an abortion because the desired abortion services would no longer be available in their area. Thus, the application of the requirement to this clinic could arguably be seen as an undue burden on women seeking late second trimester abortions.

Nevertheless, women seeking a late second trimester abortion could travel to Cleveland to obtain such an abortion, as clinics in that city provide similar services to the Dayton clinic. The record does not provide any evidence regarding what percentage of patients seeking second trimester abortions could not travel to Cleveland to have this procedure performed. Thus, there is no evidence that a "large fraction" of women seeking late second trimester abortions could not still have one by traveling to another clinic. *See Casey*, 505 U.S. at 895 (holding that a regulation is an undue burden if "in a large fraction of the cases in which [the regulation] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion"). This differentiates the facts of this case from those present in *Voinovich*. In *Voinovich*, the regulation barred statewide the most commonly used procedure for performing second trimester abortions, rendering it nearly impossible for women to choose to have an abortion during this stage of pregnancy. 130 F.3d at 201. By contrast, the transfer agreement requirement as applied to the Dayton clinic would prevent that clinic from performing late second trimester abortions, but would not prevent any other duly licensed clinic from performing those procedures. Further, it would not prevent women seeking late second trimester abortions from traveling to a clinic in Cleveland to obtain these services. While in *Voinovich*, the regulation effectively barred second trimester abortions, *id.*, in this case, the transfer agreement requirement would not bar late second trimester abortions except at the Dayton clinic. For these reasons, *Voinovich* is distinguishable. The application of the transfer agreement requirement to the Dayton clinic does not constitute an undue burden on a woman's right to choose an abortion even though it would close the only clinic providing late second trimester abortion services in southern Ohio, because women could still obtain this type of abortion in Cleveland or at other clinics providing this type of service.

Precedent also requires us to evaluate the purpose behind the governmental action in determining whether the application of the transfer agreement requirement to the Dayton clinic is an undue burden. "An undue burden exists . . . if its *purpose* or effect. . . is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *See Casey*, 505 U.S. at 878 (emphasis added). In *Casey*, the plurality suggested that governmental action that "serve[d] no purpose other than to make abortions more difficult" might be unconstitutional. *Id.* at 901. This court has further clarified that under the undue burden test, a state may not take action "simply to make it more difficult for [a woman] to obtain an abortion." *Memphis Planned Parenthood*, 175 F.3d at 461. However, when a statute has a valid purpose and only has an "incidental effect of making it more difficult or more expensive to procure an abortion[, such an incidental effect] cannot be enough to invalidate it." *Casey*, 505 U.S. at 874.

The regulation requiring ASFs to be licensed is a facially neutral regulation. *See* Ohio Rev. Code § 3702.30(E)(1). It provides that "[n]o health care facility shall operate without a license issued under this section." *Id.* Further, the transfer agreement requirement, which must be fulfilled or waived to obtain a license, is facially neutral. *See* Ohio Admin. Code § 3701-83-19(E). It states that ASFs "shall have a written transfer agreement requirement with a hospital for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise." *Id.* These regulations affect all medical facilities equally, whether they provide abortions or other types of outpatient surgery in medical specialties such as dermatology or urology. *See* Ohio Rev. Code § 3702.30(A)(1) (defining ASFs as places where outpatient surgery is routinely performed). The regulations also serve a valid purpose; they ensure that any ASF, and not just those providing abortion services, has a license to operate and meets certain minimum standards. Thus, on their face, the regulations are "not designed to strike at the right [to an abortion] itself," which weighs against finding that the purpose of the regulations was to prevent women from choosing to have an abortion. *Casey*, 505 U.S. at 874.

However, because this is an as applied challenge, we also must consider how ODH applied the regulation with respect to the Dayton clinic. The district court found that the Dayton clinic's waiver application was treated differently from those of similarly situated ASFs and that ODH was influenced by political pressure to deny its waiver application and license application. While most applications for an exemption are reviewed by the Bureau of Regulatory Compliance, the Dayton clinic's application was reviewed by the Legal Department. Russ Roeder, acting Chief of the Bureau of Regulatory Compliance at ODH, testified that he was usually involved with waiver applications but had no role in reviewing or recommending an outcome with regard to the Dayton clinic application. Rather, WMPC's application was routed through Jodi Govern, Chief Counsel for ODH, because the application cited case law. Additionally, during the application process, ODH received many letters regarding the Dayton clinic and urging it to deny a license to the facility. Most notably, Govern had communications with representatives of the Ohio and Dayton Right to Life groups regarding the status of the license application.

The district court further found that "[t]here is no evidence that Director Baird ever seriously considered whether Dr. Haskell had alternative procedures in place that would provide the same level of safety and care to his patients" as the written transfer agreement and as the procedures set in place by the other clinics that were granted a waiver. Dr. Haskell did procure the services of a back-up physician group to provide care in case of an emergency. He also had a letter from the Miami Valley Hospital Emergency and Trauma Center that stated the facility "will be available to any of your patients that have an emergency medical condition."

The district court thus had evidence before it that the Dayton clinic's application was treated differently from other applications received at ODH and that Director Baird never seriously evaluated the back-up procedures set into place by Dr. Haskell. From this evidence, it concluded that "Director Baird and ODH were affected by political pressure from constituents and politicians to find a way to shut down" the clinic.

While the district court found that Director Baird was affected by political pressure, it never made a finding that Director Baird acted with an unconstitutional purpose. Indeed, it could not have made such a finding. There was no evidence before the district court that Director Baird's purpose was to prevent women from obtaining an abortion; rather, Director Baird's application of the transfer agreement requirement only affected one abortion clinic that could not comply with the requirements set forth by the state to obtain a license. In addition to the absence of a finding that Director Baird acted with an unconstitutional purpose, ample evidence in the record establishes that he has granted

waivers and variances to other abortion clinics in the past.[8] For example, he granted a variance from the transfer agreement requirement to a now-defunct Dayton abortion clinic based on the fact that a "staff physician has admitting privileges at Miami Valley Hospital." He also granted a variance to a Cincinnati clinic based on "admitting privileges by the facility medical director at a hospital in Hamilton [C]ounty," and granted variances to abortion clinics in Columbus and Akron. Given this evidence, it cannot be said that the purpose of Director Baird's application of the transfer agreement requirement, which is a legitimate measure put into place to protect the health of patients, was to "place a substantial obstacle in the path of a woman seeking an abortion." *Casey*, 505 U.S. at 878.

We hold that the application of the written transfer agreement requirement to the Dayton clinic is not an undue burden under *Casey*. While ODH may have been affected by political pressures to deny the waiver application, the district court made no factual finding that ODH acted with an unconstitutional purpose to burden the right of women to choose an abortion. Further, while the application of the written transfer agreement requirement may serve to close the Dayton clinic, WMPC presents no evidence that a majority of the Dayton clinic's prospective patients would not be able to receive an abortion at another clinic. For these reasons, we conclude that the transfer agreement requirement as applied to the Dayton clinic does not constitute an undue burden.

IV.

The district court also concluded that the written transfer agreement requirement as applied to the Dayton clinic is unconstitutional under the Due Process Clause because the state impermissibly delegated to private parties, in this case hospitals, the authority to essentially grant a license to an abortion clinic by entering into a written transfer agreement with the clinic. Under the Ohio regulation at issue, ASFs must obtain a written transfer agreement with a hospital in order to obtain a license. Ohio Admin. Code § 3701-83-19(E). Hospitals have the unfettered power to decide whether or not to enter into an agreement. Director Baird admitted that Ohio has no power over hospitals to direct them as to how to respond to requests for written transfer agreements and that hospitals could deny such a request for business, religious, personal, or political reasons.

The Supreme Court, in *Washington ex rel. Seattle Title Trust Co. v. Roberge*, was faced with a zoning ordinance that permitted the building of a home for the elderly in a certain neighborhood only upon approval of two-thirds of the neighbors of the proposed home. 278 U.S. 116, 117-18 (1928). It found that the ordinance conditioning the grant of a permit on third party approval was "repugnant to the due process clause of the Fourteenth Amendment" because the owners were "free to withhold consent for selfish reasons or arbitrarily." *Id.* at 122. Further, there was no provision

---

[8]This evidence also distinguishes this case from the facts present in the Eighth Circuit's *Atchison* decision. 126 F.3d at 1042. *Atchison* involved an appeal from a district court decision enjoining the Iowa Department of Health from requiring an abortion clinic to comply with state certificate of need requirements. The certificate of need requirements were generally applicable rules to assist in the development of new institutional health services facilities. *Id.* at 1044. The Eighth Circuit held that the Department of Health's requirement that the clinic undergo the certificate of need process was an unconstitutional burden on the right to choose an abortion because the "requirement serve[d] no purpose other than to make abortions more difficult." *Id.* at 1049 (citing *Casey*, 505 U.S. at 878). Weighing heavily in the court's decision was the fact that similarly situated clinics that did not provide abortions across the state had been exempted from undergoing the certificate of need process. *Id.* Additionally, the court found that "Department officials could not explain the Department's deviation from its past practice" of exempting these otherwise similar clinics. *Id.*

In contrast, in this case, it is undisputed that Director Baird granted waivers to other abortion clinics in the past when those clinics were able to provide the information necessary to grant the waiver. Thus, it cannot be said, as it was in *Atchison*, that the outcome of the waiver process with respect to the Dayton clinic was reached solely because the Dayton clinic provided abortions. *See id.* ("In light of the facts and circumstances surrounding the Department's decision to apply the [certificate of need] requirements to [the abortion clinic], we can not say the district court clearly erred in finding the defendant would not have subjected the plaintiff to [certificate of need] review if the plaintiff had not intended to provide pregnancy termination services.").

for review of the neighbors' decision. *Id. See also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004) ("When a State delegates its licensing authority to a third party, the delegated authority must satisfy the requirements of due process.").

At least two district courts have addressed this issue in the context of abortion clinics. In *Hallmark Clinic v. North Carolina Department of Human Resources*, a three-judge panel held unconstitutional a written transfer agreement requirement that "placed no limits on the hospital's decision to grant or withhold a transfer agreement." 380 F. Supp. 1153, 1158 (E.D.N.C. 1974). In reaching this decision, it stated, "The Supreme Court long ago held that due process cannot tolerate a licensing system that makes the privilege of doing business dependent on official whim." *Id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). Similarly, in *Reizen*, a court in the Eastern District of Michigan held unconstitutional a written transfer agreement requirement because it delegated "unguided power to a private entity." *Birth Control Ctrs., Inc. v. Reizen*, 508 F. Supp. 1366, 1375 (E.D. Mich. 1981), *aff'd in part and vacated in part on other grounds*, 743 F.2d 352 (6th Cir. 1984).

We need not decide today whether *Hallmark Clinic* and *Reizen* were correctly decided because this licensing scheme contains an important feature that the laws at issue in those cases did not. In this case, unlike those, Director Baird retains authority to grant a waiver of the transfer agreement requirement. His ability to grant a waiver of this requirement means that the area hospitals do not necessarily have the final veto on whether an abortion clinic is licensed. In *Greenville Women's Clinic v. Commissioner, South Carolina Department of Health & Environmental Control*, the Fourth Circuit evaluated a facial challenge to a regulation that required abortion clinic providers to maintain admitting privileges at local hospitals. 317 F.3d 357, 359-60 (4th Cir. 2002). The court concluded that this regulation was not an unconstitutional delegation of licensing authority to a third party, because "the possibility that the requirements will amount to a third-party veto power is so remote that, on a facial challenge, we cannot conclude" that it violates due process.[9] *Id.* at 363. Seemingly reinforcing its decision was the fact that the regulation gave abortion clinics the right to seek a waiver from its requirements. *Id.*

We agree with Director Baird's argument and hold that his ability to grant a waiver from the transfer agreement requirement prevented the hospitals from having an unconstitutional third-party veto over WMPC's license application. Because the waiver procedure allows the state to make the final decision about whether ASFs obtain a license, there was no impermissible delegation of authority to a third party.

V.

The district court held that the plaintiffs were denied procedural due process "when Director Baird denied Dr. Haskell's request for a waiver, failed to provide him with an opportunity for a hearing on his request, and failed to provide an opportunity to appeal the denial of the waiver." It also held that the written transfer agreement requirement as applied to the Dayton clinic violated the plaintiffs' right to procedural due process.

On appeal, Director Baird argues that the district court erred, because WMPC had no property interest in the license or waiver and received all the process that was due under the circumstances. Additionally, he contends that he did not deny WMPC full and fair consideration of its waiver request. While we agree that WMPC did not have a property interest in the license or the waiver, we conclude that it did have a property interest in the continued operation of its business

---

[9]Also important to the court's decision was South Carolina's requirement that "public hospitals not act unreasonably, arbitrarily, capriciously, or discriminatorily in granting or denying admitting privileges." *Id.* at 362.

and that Director Baird denied it procedural due process when he failed to offer a pre-deprivation hearing before ordering the clinic closed.

A.

Procedural due process protects those life, liberty, or property interests that fall within the Due Process Clause of the Fourteenth Amendment. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Liberty interests include "the right of the individual to contract, to engage in any of the common occupations of life . . . and generally to enjoy those privileges long recognized . . . as essential to the ordinary pursuit of happiness by free men." *Id.* at 572 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest. *See Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).

The district court concluded that Dr. Haskell had a property right in the ongoing operation of his clinic and that he would be deprived of his property interest if Director Baird's order to cease operating the clinic remained in effect. It further determined that Dr. Haskell was not afforded adequate procedural rights prior to the issuance of the cease-and-desist letter. It specifically referenced that: the written transfer agreement requirement permitted hospitals to arbitrarily deny Dr. Haskell the ability to operate his clinic; the denial of the waiver or variance is not appealable; Director Baird failed to give WMPC's request for a waiver full and fair consideration; and Director Baird failed to consider fully whether granting the waiver would jeopardize the health and safety of the Dayton clinic's patients.

Director Baird first contests the district court's conclusion that WMPC had a property interest in the continued operation of the Dayton clinic. He argues that because the Dayton clinic never had a license, it does not have a property interest in one.

This court has held that first-time applicants for liquor or entertainment licenses do not have a protected property interest. *See Wojcik v. City of Romulus*, 257 F.3d 600, 609-10 (6th Cir. 2001). New applicants for these types of licenses do "not have a property interest so as to entitle them to procedural or substantive due process rights in the same way that an existing permit holder might demand." *Id.* at 610. Based on this precedent, WMPC has no property or liberty interest in a license for its operation because it was a first-time applicant for the ASF license.

Nonetheless, due process protects an interest in the continued operation of an existing business. The Dayton clinic has been in operation since 1983. The requirement that it obtain a license to operate as an ASF did not arise until later. Thus, if the Dayton clinic cannot obtain a license, it will be closed permanently despite having a long history of operation.

This court has recognized that the Constitution protects a person's choice of careers and occupations. *See Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983) ("Liberty and property interests are intricately related in our system of political economy, a system based on free choice of careers and occupations, private property, and the right to compete."). In *Sanderson v. Village of Greenhills*, a case similar to the current case, Sanderson opened a billiards establishment, which the local government promptly closed because it did not have an "amusement device" license. 726 F.2d

284, 285 (6th Cir. 1984).  Sanderson applied for the amusement license; the city denied his request, because it did not want a billiards hall in the town.[10]  *Id.* at 287.  This court stated,

> Although the defendants, and the court below, are quite correct in asserting that there can be no *unfettered* freedom to engage in a business which may be properly regulated pursuant to a municipality's general police power, such an assertion does not resolve the issue of whether the clear freedom, or liberty, to engage in even a potentially regulated business was *properly* circumscribed in this case.

*Id.* at 286-87.  Based on this precedent, Dr. Haskell and WMPC have a protected property interest in the continued operation of the Dayton clinic.[11]

Next, Dr. Haskell must show that the government's actions operated to deprive him of his protected interest.  Director Baird's action in proposing to issue an order denying the Dayton clinic a license resulted in the issuance of a cease-and-desist order.  This order deprived Dr. Haskell of his protected interest in operating his business, as it demanded that he immediately stop operating the Dayton clinic.

Finally, Dr. Haskell must show that the state did not afford him adequate process prior to depriving him of his protected interest.  Director Baird argues that WMPC could have obtained an administrative hearing and judicial review of the proposed license denial, but chose not to do so.  The record contains the letter from Director Baird to Dr. Haskell proposing to issue an order denying WMPC's license application and denying WMPC's request for a waiver.  The letter specifically states that Dr. Haskell could "request a hearing before [Director Baird] or my duly authorized representative regarding [his] proposal to deny the license to operate."  WMPC did not request a hearing, but rather proceeded to federal court.

It is true that Ohio law provides several procedural protections after initial denial of a license application.  The denial of a license application entitles the clinic to an administrative hearing, Ohio Rev. Code § 119.06, a hearing complete with a right to notice as well as the opportunity to be represented by counsel, to present evidence and to examine witnesses appearing for and against the clinic, *id.* § 119.07; *see also id.* § 119.09.  An adverse outcome in the administrative hearing may be appealed to the state courts.  *Id.* § 119.12.  In addition to these administrative and judicial appeals, a facility denied a license may apply to the Director (either before or after the appeals) for a waiver of the license requirements.  *See* Ohio Admin. Code § 3701-83-14.  In a typical license application situation, where the license is sought prior to operation of the business, these provisions offer ample procedural protections.

Here, however, the same day ODH issued its letter proposing to deny WMPC a license (and offering it a hearing under the aforementioned Ohio laws), it also issued a cease-and-desist order requiring the Dayton clinic to close.  If the Dayton clinic did not close, ODH threatened to impose a civil penalty for operating without a license as well as additional penalties for each day that the clinic continued operating.  The cease-and-desist order operated to prevent WMPC from obtaining a hearing prior to deprivation of its property interest in its ongoing business.  In *Hahn*, this court

---

[10]In *Sanderson*, the court agreed that Sanderson "was not entitled to a license and thus he suffered no constitutional injury upon its deprivation."  *Id.* at 286.

[11]Other courts have also held that a person has a property interest in continued operation of a business.  *See United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969) ("The right to pursue a lawful business . . . has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution."); *Small v. United States*, 333 F.2d 702, 704 (3d Cir. 1964) ("The right to pursue a lawful business or occupation is a right of property which the law protects against intentional and unjustifiable interference.").

stated that plaintiffs can establish a procedural due process violation if "the state did not afford them adequate procedural rights prior to depriving them of their protected interest." 190 F.3d at 716. Similarly, in *Zinermon v. Burch*, the Supreme Court stated:

> In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking. Conversely, in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake, or where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process.

494 U.S. 113, 132 (1990) (citations omitted) (also stating that there is no valid reason to distinguish between property and liberty interests in assessing need for pre-deprivation hearing). In this case, a pre-deprivation hearing would not have been unduly burdensome, especially given the property interest at stake, namely continued operation of business. Further, Ohio cannot argue that it was "truly unable to anticipate and prevent a random deprivation of a liberty interest" given that it issued a cease-and-desist letter that served to close the Dayton clinic. Under the reasoning in *Zinermon*, the post-deprivation remedy of a hearing on the proposed license denial does not satisfy procedural due process.

We conclude that Director Baird violated WMPC's procedural due process rights when he ordered the Dayton clinic closed. Because he issued a cease-and-desist order that required the clinic to immediately cease operations, he effectively prevented WMPC from obtaining a pre-deprivation hearing on the proposed license denial.

Judge Sutton's dissenting opinion on this issue focuses on both the pre-deprivation history of WMPC's licensing application process and the post-deprivation remedies available to WMPC. Turning first to the pre-deprivation history, the rather protracted pre-deprivation activities bear no relation to the ultimate denial of a waiver and the state's basis for this decision. From my perspective, it is simply irrelevant to the procedural due process issue before us that WMPC previously litigated in state court the question of whether it was an ambulatory surgery facility to which the licensing requirement applied. Similarly, inspections conducted as a matter of course during the licensing process do not properly affect our analysis.

Nor can WMPC's request for a waiver be appropriately characterized as an opportunity to be heard or respond. To be sure, its letter to ODH describes the arrangements made by Dr. Haskell for emergency treatment of his patients, concedes the impossibility of obtaining a transfer agreement for the Dayton facility, makes a legal argument that denying the license under the circumstances would violate the clinic's substantive due process rights, and refers to a waiver granted to another clinic that could not obtain a transfer agreement. It does not address, however, the basis for Director Baird's decision to deny the waiver–that the arrangement with the practice group was not a sufficient protection for patients. Indeed, since it preceded the decision, it can hardly be characterized as a "pretermination opportunity to respond." *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985). The case law contemplates at a minimum some chance to react to proposed governmental action before deprivation occurs. *See, e.g.*, *Loudermill*, 470 U.S. at 542 ("An essential principle of due process is that a deprivation of life, liberty, or property 'be *preceded* by notice and opportunity for hearing appropriate to the nature of the case.'"(quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)) (emphasis added)); *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) ("[A]n individual [must] be given an opportunity for a hearing *before* he is deprived of any significant property interest." (alterations added)).

As previously noted in this opinion and in the dissent, an array of state post-deprivation remedies were available to WMPC. Yet, this is not a situation in which a post-deprivation remedy

alone will suffice to meet the requirements of due process. *See Leary v. Daeschner*, 228 F.3d 729, 743 (6th Cir. 2000) ("In some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required."). The state has not argued that granting a pre-deprivation opportunity to be heard would impose any burden or that any public policy reason existed for shutting down the clinic's operations simultaneously with the denial of the license, and WMPC's interest in continuing to operate its business is strong.

Finally, the dissent takes the position that no hearing is required, either pre-deprivation or post-deprivation, because there is no material fact for resolution at a hearing. In my judgment, there is a fact issue for hearing, that is, whether Dr. Haskell's alternative arrangements for emergency treatment for his patients will adequately protect them. Director Baird's ability to exercise discretion in acting on a waiver means that he can deny the waiver after hearing, but it also means that he could grant the waiver–without departing from any regulation or any legal requirements. The decision is properly his, not ours.

B.

The district court also concluded that Director Baird denied WMPC its procedural due process rights, because the waiver decision was not appealable and the process through which the waiver was denied did not appear to fully and fairly consider the alternative procedures proposed by Dr. Haskell. The district court found that Director Baird "failed to give [WMPC's] request for a waiver full and fair consideration." It also found that "Director Baird denied Dr. Haskell's request for a waiver principally because he failed to obtain a written transfer agreement from a local hospital" and that Director Baird did not consider whether the alternative procedures proposed by Dr. Haskell would ensure the same level of care as that provided by a written transfer agreement. Finally, it concluded that "Director Baird and ODH were affected by political pressure from constituents and politicians to find a way to shut down Dr. Haskell's Dayton Clinic."

As a preliminary matter, the district court's reasons for determining that WMPC was not afforded adequate procedural rights with respect to the waiver application were misplaced. Its criticisms impermissibly focus on the outcome of the waiver request and the balancing of the issues involved in it, rather than whether there was a lack of process in the denial of the waiver.

More importantly, even if Director Baird did view the application in a slanted fashion, Ohio law grants him absolute discretion when he is deciding whether to approve a waiver request. Ohio Admin. Code § 3701-83-14(D). This court has held that "a party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002). Where "an official has unconstrained discretion to deny the benefit, a prospective recipient of that benefit can establish no more than a 'unilateral expectation' to it." *Id.* at 409-10 (quoting *Roth*, 408 U.S. at 577). Thus, WMPC had no property interest in the waiver and no right to due process before the waiver was denied. The district court erred in concluding that the denial of the waiver violated WMPC's right to procedural due process.

VI.

Director Baird also appeals the award of attorneys' fees and expenses to WMPC. After the district court granted a permanent injunction to WMPC, WMPC moved for attorneys' fees and expenses under 42 U.S.C. § 1983. The district court determined that WMPC was a prevailing party and ordered Director Baird to pay attorneys' fees and expenses in the amount of $147,617.66. Director Baird does not dispute the amount of fees awarded to WMPC; rather, he argues that if this court reverses the district court's decision, WMPC would no longer be the prevailing party as required to receive attorneys' fees and expenses.

The district court, "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. Thus, in order for a plaintiff to receive attorneys' fees, the plaintiff must be the prevailing party. A plaintiff may be considered a prevailing party if the plaintiff "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties," *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989), such that "the defendant's behavior [is modified] in a way that directly benefits the plaintiff," *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). A plaintiff does not need to prevail on all claims asserted in the complaint to be awarded attorneys' fees. *Berger v. City of Mayfield Heights*, 265 F.3d 399, 406 (6th Cir. 2001).

WMPC remains a prevailing party because we conclude that Director Baird violated its procedural due process rights when he issued a cease-and-desist letter requiring the Dayton clinic to close before WMPC could obtain a hearing on the proposed denial of its license application. Thus, we affirm the grant of attorneys' fees and expenses.

VII.

In sum, we reverse the district court's decision with respect to its conclusions that the application of the transfer agreement requirement (and license requirement) to the Dayton clinic constituted an undue burden under *Casey* and that the Dayton-area hospitals had an unconstitutional third-party veto over the Dayton clinic's license. We affirm the district court's conclusion that Director Baird violated the plaintiffs' procedural due process rights when he ordered the clinic closed before a hearing could be held on the proposed denial of the license application. We also affirm the award of attorneys' fees and expenses.

Under well-settled law, a party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer "continuing irreparable injury" for which there is no adequate remedy at law. *Kallstrom*, 136 F.3d at 1067. Because, in this case, the procedural due process violation can be remedied by allowing WMPC and Dr. Haskell to have a hearing, we vacate the district court's grant of a permanent injunction. We remand the case for further proceedings not inconsistent with this opinion. WMPC and Dr. Haskell are entitled to have a hearing on the proposed denial of their license application for the Dayton clinic prior to ODH taking any action to close the clinic, such as issuing a cease-and-desist order. We question what the result of a hearing might be, since Director Baird can validly apply the written transfer agreement requirement to WMPC and Dr. Haskell. Moreover, we realize that the parties are at an impasse because Director Baird states that he would grant the waiver to the transfer agreement requirement if he received information about the back-up physicians and Dr. Haskell will not provide those names absent a promise that the names will be kept confidential. Nevertheless, since we are not the state decisionmakers, it would be inappropriate for us to presume what decision might be reached during the hearing, particularly considering that the position of the parties might change before the hearing. For this reason, a remand is appropriate.

---

### CONCURRING IN PART, DISSENTING IN PART

---

SUTTON, Circuit Judge, concurring in part and dissenting in part.  In *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 196–97 (6th Cir. 1997), the Sixth Circuit invalidated an Ohio law prohibiting a late-term abortion procedure on the ground that it imposed an "undue burden" on a woman's right to obtain an abortion because it failed to contain a "maternal health exception."  Three years later, the Supreme Court effectively upheld that ruling when it invalidated a similar Nebraska law on the ground that it did not contain a maternal-health exception.  *See Stenberg v. Carhart*, 530 U.S. 914, 930–31 (2000) ("[R]equir[ing] an exception where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother.") (internal quotation marks omitted); *id.* ("[A] State may promote but not endanger a woman's health when it regulates the methods of abortion."); *id.* ("[A] State cannot subject women's health to significant risks.").

At issue in today's case is a generally applicable licensing provision that contains a maternal-health *requirement* and that is being applied to a facility that performs the late-term abortion procedure addressed in *Women's Medical Professional Corporation* and *Carhart*.  Even if the implementation of a generally applicable law designed to protect maternal health could establish an "undue burden," I agree with Judge Gibbons' well-reasoned opinion that this requirement does not.  I agree with the majority that the Women's Medical Professional Corporation (WMPC) does not have a cognizable due process claim that the State impermissibly delegated its licensing authority to private third parties.  And I agree that WMPC does not have a cognizable due process claim with respect to Director Baird's discretionary decision to deny the facility a waiver.  Because I additionally believe that the three years of process provided by the State to WMPC before denying this license application did not violate the predeprivation requirements of the Due Process Clause, I respectfully dissent from that portion of the majority's decision to the contrary.

To understand why the State did not violate WMPC's rights to a predeprivation hearing, it helps to put the State's handling of this case in context—to consider all of the process that the WMPC received *before* the licensing decision and all of the procedural options available to it *after* the licensing decision.  On November 10, 1999, Dr. Baird informed WMPC and other abortion facilities that they needed to obtain an ambulatory-surgical-facility license if they wished to continue in operation.  After receiving this notice, WMPC filed an action in state court contending that abortion clinics did not fall within the definition of an ambulatory surgery facility under state law and therefore did not have to satisfy the licensing requirement.  In bringing this state-court action, WMPC sought—and received—a stay of the licensing requirement, permitting its facilities to continue performing abortions throughout the state-court litigation.  In August 2002, an Ohio court of appeals concluded that abortion clinics must satisfy this licensing requirement.  *See Founder's Women's Health Ctr. v. Ohio State Dep't of Health*, Nos. 01AP-872, 01AP-873, 2002 Ohio App. LEXIS 4345 (Ohio Ct. App. Aug 15, 2002).

In October 2002, WMPC applied for a license for its Dayton facility.  In response, the State conducted two inspections, one to inform the clinic of any licensing shortfalls, the other to check that all necessary corrections had been made.  In December 2002, shortly after Miami Valley Hospital rescinded the written transfer agreement it had previously signed with WMPC, the clinic applied to the State for a waiver of the transfer-agreement requirement, setting out the facility's legal and factual arguments, including its submission that an anonymous group of OB/GYN doctors with admitting privileges at area hospitals had orally agreed to serve as back-up physicians for the clinic.

On January 9, 2003, after reviewing WMPC's license application, after conducting two inspections of the facility, after communicating at considerable length back and forth about the license requirement and after waiting until the end of the state-court litigation commenced in 1999 regarding the applicability of the license requirement to abortion providers, Dr. Baird issued a letter to Dr. Haskell "propos[ing] to issue an order denying" the license application. JA 328. The letter explained that the facility had failed to meet Ohio's generally applicable written-transfer-agreement requirement for ambulatory surgical facilities and "notified" Dr. Haskell that he "may request a hearing . . . regarding [the] proposal to deny the license to operate." *Id*. "At any hearing," it added, "you may appear in person or be represented by your attorney, you may present evidence, and you may examine witnesses appearing for and against you." *Id*. It then added, in underscored language, that "[a] request for hearing must be made within thirty (30) days of the date of mailing of this notice." *Id.* at 329. Under Ohio law, Dr. Baird's proposed denial of the license would have become final after 30 days (if WMPC had opted not to appeal) or after the end of the hearing (if WMPC had appealed). *See* Ohio Rev. Code § 119.06–07; § 3702.30(e)(1). Once the administrative decision became final, Ohio law gave WMPC the right to appeal any adverse decision to the Ohio court of common pleas. *See id*. § 119.12.

On January 9, 2003, Dr. Baird also issued two related letters to Dr. Haskell and WMPC. In one, he denied WMPC's request for a waiver from the written-transfer-agreement requirement "because I am not able to find that granting your waiver request would not jeopardize the health and safety of any patient as provided in OAC 3701-83-14(B)." JA 327. "It is my belief," he reasoned, "that the tacit agreement made between the Women's Medical Center Director and unnamed members of an area Obstetrics-Gynecology practice is not a sufficient protection for the health and safety of an ambulatory surgical facility patient who may face a serious medical complication or other emergency situation arising from a surgical procedure performed in an ambulatory surgical environment." *Id*. In the other letter, Dr. Baird issued a cease-and-desist order preventing the facility from continuing to operate without a license.

Up to this point, the State had provided WMPC with a little more than three years of predeprivation process regarding the license requirement. Even then, WMPC still had a right to seek an administrative hearing on the "proposed" denial of its license application as well as state-court review of the agency's decision. It still had a right to seek a stay of enforcement of the licensing requirement (and the cease-and-desist order). And it still had a right to file another waiver request at the end of the administrative and appeals process based on any information learned during that process or based on any developments in the interim (including the possibility that back-up doctors for WMPC would be willing to disclose their names to Dr. Baird).

Having received these opportunities to protect its property interest in its business, having chosen to pretermit the remaining procedural options available to it and having chosen instead to file this action in federal court, WMPC cannot tenably claim that the process provided by the State between the original notice to WMPC in November 1999 and the final proposed notice in January 2003 failed to comply with due process. In reaching a contrary conclusion, the majority focuses on the fact that Dr. Baird issued a cease-and-desist order on the same day that he issued his "proposed" denial of the licensing application.

In one sense, I share the majority's bewilderment that the director simultaneously "proposed" the denial of a license and issued a cease-and-desist order that (from the perspective of the recipient) seemed to be anything but a "proposal." Why he did not propose the denial of a license and communicate that a cease-and-desist order would issue once his proposed decision became final—either at the end of 30 days (if no hearing was requested) or at the end of any hearing (if a hearing was requested)—is a mystery that neither the record nor state law appears to resolve. But this bureaucratic curiosity does not transform this sequence of events into a cognizable due process claim for three reasons.

One, as WMPC well knew, it had an opportunity to seek a stay of the cease-and-desist order from the director during further administrative proceedings and, failing that, it had an opportunity to seek a stay of the order in state court. *See Franklin County Sheriffs Dep't v. State Employment Relations Bd.*, 589 N.E.2d 24, 33 (Ohio 1992); *Franklin County Sheriffs Dep't v. State*, No. 89AP-792, 1990 Ohio App. LEXIS 3814 (Ohio Ct. App. Aug. 28, 1990); *Commercial Motor Freight, Inc. v. Pub. Utils. Comm'n*, 348 N.E. 2d 132 (Ohio 1976); *see also State v. Nihiser*, No. 03CA21, 2004 Ohio App. LEXIS 3709, at *10–11 (Ohio Ct. App. Aug. 2, 2004); *Boland v. Hammond*, 759 N.E.2d 789 (Ohio Ct. App. 2001); *Ohio Univ. v. Ohio Civ. Rights Comm'n*, No. 96CA1721,1996 Ohio App. LEXIS 4532 (Ohio Ct. App. Oct. 4, 1996); *City of Ironton v. Bd. of Tr. of the Lawrence County Gen. Hosp.*, No. 1772, 1986 Ohio App. LEXIS 9944 (Ohio Ct. App. Dec. 18, 1986).  I say that WMPC "well knew" that it had this opportunity because it had previously sought—and obtained—a stay of the licensing requirement after it was first informed by Dr. Baird in November 1999 that it needed a license.  The record does not contain any indication that the State would have opposed a stay of the cease-and-desist order had WMPC sought one in connection with a request for an administrative hearing and appeal.

Two, before the State issued the cease-and-desist order, it had provided over three years of process, which included notice of the licensing requirements, state-court litigation over the applicability of the licensing requirement to WMPC, notice of failings in WMPC's license application, the opportunity to correct those failings, two visits by the State to WMPC's Dayton facility, numerous opportunities for WMPC to express its position on the licensing requirement and for the State to respond, and a waiver application designed to meet the one requirement of the license that WMPC had been unable to satisfy.  These procedures—and above all these numerous opportunities for WMPC to present its position on the license application—assuredly satisfy the predeprivation requirements of due process.  As this requirement demands only "some pretermination opportunity to respond, coupled with post-termination administrative procedures," *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547–48 (1985), the process that the State provided before issuing the cease-and-desist order assuredly was all the process that was due. *See also Leary v. Daeschner*, 228 F.3d 729, 741 (6th Cir. 2000) (interpreting the pretermination requirement as "an opportunity to be heard").  Indeed, the opportunity to present one's case in writing—which happened here as a matter of opportunity and fact—by itself would have sufficed to meet the predeprivation-hearing requirement. *See Loudermill*, 470 U.S. at 546; *Leary*, 228 F.3d at 743; *see also Am. Towers, Inc. v. Williams*, No. 01-7141, 2002 U.S. App. LEXIS 22845, at *4 (D.C. Cir. Oct. 30, 2002); *Raditch v. United States*, 929 F.2d 478, 480 (9th Cir. 1991).  And the cases cited by the majority that involve government action not requiring a predeprivation hearing, *see Zinermon v. Burch*, 494 U.S. 113 (1990), and *Hahn v. Star Bank*, 190 F.3d 708 (6th Cir. 1999), plainly do not mandate a predeprivation hearing here.  To my knowledge, no case has ever held that such a lengthy set of opportunities to be heard, as WMPC had in this instance, violates the predeprivation requirements of due process.

Nor has WMPC identified a single issue of material fact that remains to be resolved or could be resolved through further administrative hearings.  All of which prompts the question of what this judicially ordered predeprivation hearing will accomplish.  From where I sit, I cannot understand what WMPC still wishes to ascertain or advocate in an administrative hearing.  Indeed, the stay of the cease-and-desist order in federal court has given WMPC an additional two years to seek an administrative hearing or file a state-court appeal regarding the license application, but it still has not chosen to seek one.

That leads to the third defect in this constitutional claim.  Due process does not mandate a hearing (whether predeprivation or postdeprivation) when the claimant does not raise an issue of material fact that a hearing could resolve. *See Dixon v. Love*, 431 U.S. 105 (1977); *Elsenety v. Health Care Fin. Admin.*, No. 02-3004, 2003 U.S. App. LEXIS 26367, at *10–11 (6th Cir. Dec. 9, 2003); *Pennsylvania v. Riley*, 84 F.3d 125, 130 (3d Cir. 1996); *Puerto Rico Aqueduct and Sewer*

*Auth. v. EPA*, 35 F.3d 600, 606 (1st Cir. 1994); *Moreau v. FERC*, 982 F.2d 556 (D.C. Cir. 1993); *Altenheim German Home v. Turnock*, 902 F.2d 582, 585 (7th Cir. 1990). Where the law constrains a government decision and where the parties agree that a legal requirement has not been met, an individual does not have the right to an appearance before the decisionmaker solely for the sake of making an appearance before the decisionmaker. *See Dixon*, 431 U.S. at 113–14 ("Since appellee does not dispute the factual basis for the Secretary's decision, he is really asserting the right to appear in person only to argue that the Secretary should show leniency and depart from his own regulations. Such an appearance might make the licensee feel that he has received more personal attention, but it would not serve to protect any substantive rights. We conclude that requiring additional procedures would be unlikely to have significant value.").

*Dixon*, to use one example, held that due process did not entitle drivers to a hearing before the revocation of their licenses if they objectively did not meet one of the legal requirements for obtaining a license. *Id.* What is true for the license required in *Dixon*, it seems to me, is equally true of the license required here. Ohio has established licensing requirements for operating an ambulatory surgical facility, and both sides agree that the Dayton facility will not receive a license unless it satisfies one of two legal requirements—either obtains a written transfer agreement or identifies back-up doctors with privileges at area hospitals. WMPC may not invoke the Due Process Clause to obtain further hearings solely to "argue that the decisionmaker should be lenient and depart from legal requirements." *Loudermill*, 470 U.S. at 543 n.8. Yet such leniency is all that WMPC seeks here. No one disputes that Dr. Baird has consistently required back-up doctors to be identified in order for WMPC (and other regulated facilities) to obtain a waiver. And it escapes me how a hearing could be held about whether *anonymous* back-up doctors will adequately protect the clinic's patients in the event of a medical emergency—particularly when the waiver decision, all agree, remains discretionary. On this record, in short, WMPC has no more right to a hearing than a litigant against whom summary judgment was properly granted has a right to a jury trial. The majority having concluded otherwise, I respectfully dissent from that portion of its decision.