MANION, Circuit Judge,
concurring in part and in the judgment.
I agree with the court that the temporary restraining order and the subsequent preliminary injunction were appropriate. The Wisconsin law at issue requires abortion doctors to obtain admitting privileges at a hospital no more than 30 miles from the clinic in which the abortion is performed. 2013 Wis. Act 37, § 1 (codified at Wis. Stat. § 253.095(2)). As I explain below, the legislature had a rational basis to enact the law. However, the law was signed by the governor on a Friday and took effect the following Monday. The law’s immediate effective date made it impossible for the doctors employed at the various clinics providing abortion services to seek and obtain admitting privileges at a nearby hospital. The injunctive relief has now been in place for nearly half a year, so abortion doctors have had plenty of time to secure admitting privileges. However, in this appeal, Wisconsin has only argued that the original entry of the injunction was error, so whether the injunction remains appropriate will- be decided on remand. I also agree with the court about third-party standing. There is no need for the parties to dwell on this issue.
As the court notes, at this juncture, “the Seventh Circuit’s review of the preliminary injunction order will likely provide guidance to the court and the parties on the law and its application to the facts here.” Maj. Op. at 788. The court has expressed rather extensive guidancé for the district court on remand. At this point, I hope to offer some of my own observations on the legitimate interests that are furthered by the requirements of Wisconsin Act 37 and the nature of the burdens that the requirements may impose on access to abortion.
The Two-Part Test for Laws Regulating the Provision of Abortions
“Where it has a rational basis to act, and it does not impose an undue burden, the State may” regulate the provision of abortions. Gonzales v. Carhart, 550 U.S. 124, 158, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). Thus, legislation regulating abortions must past muster under rational basis review and must not have the “practical effect of imposing an undue burden” on the ability of women to obtain abortions. See Karlin v. Foust, 188 F.3d 446, 481 (7th Cir.1999); Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 734 F.3d 406, 411 (5th Cir.2013), application to vacate stay of injunction denied, — U.S. -, 134 S.Ct. 506, 187 L.Ed.2d 465 (2013).
*800 Step 1: Rational Basis
At the first step, we must presume that the admitting-privileges requirement is constitutional, and uphold it so long as the requirement is rationally related to Wis-consin’s- legitimate interests. See St. John’s United Church of Christ v. City of Chicago, 502 F.3d 616, 637-38 (7th Cir.2007) (quoting City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Wisconsin asserts that its admitting-privileges requirement furthers its legitimate interests in protecting the health of mothers and in maintaining the professional standards applicable to abortion doctors. Carhart, 550 U.S. at 157, 127 S.Ct. 1610; Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The question, then, is whether Wisconsin’s adoption of the admitting-privileges requirement is rationally related to these interests. “Under rational basis review, ‘the plaintiff has the burden of proving the government’s action irrational,’ and “[t]he government may defend the rationality of its action on any ground it can muster, not just the one articulated at the time of decision.’ ” RJB Props., Inc. v. Bd. of Educ. of Chicago, 468 F.3d 1005, 1010 (7th Cir.2006) (quoting Smith v. City of Chicago, 457 F.3d 643, 652 (7th Cir.2006)).
The court suggests that Wisconsin must come forward with medical evidence that the admitting-privileges requirement furthers the State’s legitimate interests. Maj. Op. at 798. But, under rational basis review, Wisconsin’s legislative choice “may be based on rational speculation unsupported by evidence or empirical data.” F.C.C. v. Beach Commc’ns, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). States have “broad latitude” to regulate abortion doctors, “even if an objective assessment might suggest that” the regulation is not medically necessary. Mazurek v. Armstrong, 520 U.S. 968, 973, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (quotation marks and emphasis omitted). Thus, the Supreme Court has rejected as misguided arguments that an abortion law is unconstitutional because the medical evidence contradicts the claim that the law has any medical basis. Id.; see also Greenville Women’s Clinic v. Bryant, 222 F.3d 157, 169 (4th Cir.2000) (“[Tjhere is no requirement that a state refrain from regulating abortion facilities until a public-health problem manifests itself. In Dan-forth, for -example, the [Supreme] Court upheld health measures that ‘may be helpful’ and ‘can be useful.’ ” (quoting Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 80-81, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976))). In sum, Wisconsin need offer only “a ‘conceivable state of facts that could provide a rational basis’ for requiring abortion physicians to have hospital admission privileges.” Abbott, 734 F.3d at 411 (quoting F.C.C., 508 U.S. at 313, 113 S.Ct. 2096).

The Medical Professions’ Support for Admitting Privileges

In 2003, the American College of Surgeons issued a statement on patient-safety principles that reflected a consensus in the surgical community “on a set of 10 core principles that states should examine when moving to regulate office-based procedures.” [1] These principles were based on a document that was unanimously agreed to by medical associations of every stripe, *801 including the American Medical Association and the American College of Obstetricians and Gynecologists. Core Principle # 4 provides that “[pjhysicians performing office-based surgery must have admitting privileges at a nearby hospital, a transfer agreement with another physician who has admitting privileges at a nearby hospital, or maintain an emergency transfer agreement with a nearby hospital.” Unsurprisingly, the National Abortion Federation has specifically recommended that “[i]n the case of emergency, the doctor should be able to admit patients to a nearby hospital (no more than 20 minutes away).” National Abortion Federation, Having an Abortion? Your Guide to Good Care (2000) (pamphlet), available at http://web.archive. org/web/2 0000619200916/http://www. prochoice.org/pregnant/ goodcare.htm (internet archive of NAF website on June 19, 2000) (hereinafter, “NAF Guide to Good Care ”). This should be sufficient to establish that Wisconsin’s admitting-privileges requirement is reasonably designed to promote the state’s legitimate interest in women’s health. And, as the court recognizes, Wisconsin is one of twelve states adopting such a requirement. Maj. Op. at 791.

The Benefits of Admitting Privileges in an Emergency Situation

Further, the parties agree that at least a small number of abortions result in complications that require hospitalization.[2] Wisconsin offers doctors’ declarations establishing that the admitting-privileges requirement expedites the admission process and avoids mis-communications between the patient and the hospital in situations where swift treatment is critical. See J.A. 149-50, ¶¶ 12-19 (Decl. of Dr. James Anderson);- 175-76, ¶ 14 (Decl. of Dr. Matthew Lee); 184, ¶ 9 (Decl. of Dr. Linn); 237-38, ¶¶ 6-12 (Decl. of Dr. David C. Merrill); 332-33, ¶¶ 25-31 (Decl. of Dr. John Thorp); see also Darrell J. Solet, MD, et al., Lost in Translation: Challenges and Opportunities to Physician-to-Physician Communication During Patient Handoffs, 80 Academic Medicine 1094, 1097 (Dec. 2005) (observing, in the context of patient transfers, that “poor communication in medical practice turns out to be one of the most common causes of error”). After all, the abortion doctor is better acquainted with his patient’s medical history and is in a better position to quickly diagnose complications resulting from the procedure. See J.A. 238, ¶ 12 (Decl. of Dr. Merrill); 332, ¶ 25 (Decl. of Dr. Thorp). Additionally, the admitting-privileges requirement ensures “that a physician will have the authority to admit his patient into a hospital whose resources and facilities are familiar to him....” Women’s Health Ctr. of W. Cnty., Inc. v. Webster, 871 F.2d 1377, 1381 (8th Cir.1989) (quotation marks omitted).

The Oversight Function of the Admitting-Privileges Requirement

Moreover, “[t]he requirement that physicians performing abortions must have hospital admitting privileges helps to ensure that credentialing of physicians beyond initial licensing and periodic license *802 renewal occurs.”[3] Abbott, 734 F.3d at 411. Thus, Wisconsin’s admitting-privileges requirement adds an extra layer of protection for all of the patients of abortion doctors. Indeed, every circuit to address the issue has held that admitting-privileges requirements further states’ legitimate interests. Abbott, 734 F.3d at 412 (“We have little difficulty in concluding that, with regard to the district court’s rational basis determination, the State has made a strong showing that it is likely to prevail on the merits.”); Greenville Women’s Clinic v. Comm’r, S.C. Dep’t of Health & Envtl. Control, 317 F.3d 357, 363 (4th Cir.2002) (“These requirements of having admitting privileges at local hospitals and referral arrangements with local experts are so obviously beneficial to patients.”); Webster, 871 F.2d at 1381 (Missouri’s admitting-privileges requirement “furthers important state health objectives.”).

Admitting Privileges and Other Outpatient Surgeries

The court emphasizes the fact that Wis-consin has not imposed an admitting-privileges requirement on doctors who perform outpatient procedures other than abortion. But the plaintiffs bear the burden of proof and have offered no evidence that doctors in those other fields have a lack of admitting privileges — as do abortion doctors— which would necessitate a legislative response. Moreover, there is no mandate that state legislatures uniformly regulate medical procedures-or regulate medical procedures with higher or even the highest incidents of complications. States “may select one phase of one field and apply a remedy there, neglecting the others.” Williamson v. Lee Optical of Okla. Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Finally, Wisconsin had a perfectly good reason for addressing abortion first-namely, the Gosnell scandal.

The Dr. Kermit Gosnell Scandal

There has been no high-profile exposure of substandard care by doctors who perform outpatient procedures other than abortion. However, just a few weeks prior to the enactment of Wisconsin’s admitting-privileges requirement, there was a shocking revelation of terrible conditions and procedures at an abortion clinic that received nationwide attention. On May 13, 2013, a Philadelphia abortion doctor, Dr. Kermit Gosnell, was convicted of three counts of first-degree murder for the death of three infants delivered alive but subsequently killed at his clinic. The record in this appeal contains articles extensively discussing the egregious health care practices at Dr. Gosnell’s clinic leading up to his conviction. These include bloody floors and unlicensed employees conducting gynecological examinations and administering painkillers, resulting in the death of a patient. See J.A. 154 (Joann Loviglio, Abortion Doctor Suspended After Philadelphia Raid: ‘Deplorable’ Conditions Reported At Kermit Gosnell’s Office, The Huffington Post, Feb. 23, 2010, http:// www.huffingtonpost.com/2010/02/23/ abortion-doetor-suspendecLn_473963. html). In addition, media reports circulated that, among other things, Dr. Gosnell *803 physically assaulted and performed a forced abortion on a minor and left fetal remains in a woman’s uterus causing her excruciating pain.[4] Although these details were first publicized after Dr. Gosnell’s arrest in 2011, the case did not garner national attention until his trial in March 2013. Unsurprisingly, the case provoked shock and outrage, prompting a heightened concern for the health of women seeking abortions. In addition to Dr. Gos-nell’s ease, Wisconsin identifies numerous other examples of egregious and substandard care by abortion providers and clinics. See Appendix to the Concurrence; J.A. 154-56.
On June 4, 2013, Wisconsin Act 37, which contained the admitting-privileges requirement, at issue in this appeal and also contained an ultrasound requirement, was introduced in the Wisconsin Senate. On June 12, the Act passed in the Senate. On June 13, the Act passed in the Assembly, where it was returned to the Senate and presented to the governor for his signature on July 3. On July 5, the Act was signed into law by the governor. This timeline demonstrates that Wisconsin legislators promptly responded to their constituents’ concerns. Wisconsin Act 37 was a response to the dangers (graphically illustrated by Dr. Gosnell’s case) to women’s health and the right to freely exercise their choice.

The Interaction Between the Act’s Admitting-Privileges and Ultrasound Requirements

In addition, the admitting-privileges requirement furthers the Act’s ultrasound requirement. See Wis. Stat. § 253.10(3)(c). Performing an ultrasound allows an abortion doctor to get a clear picture of the woman’s pregnancy — including the gestational age and size of the unborn child, whether there are twins, whether the heart is beating,[5] and the orientation of the unborn child within the uterus — which allows the doctor to anticipate any likely complications. The law requires that, absent an emergency, the woman receive an ultrasound at the clinic or elsewhere. Accordingly, regardless of where the ultrasound is performed, important and easily determinable facts about the pregnancy are available to the abortion doctor. Additionally, the ultrasound must be explained to the woman so that she can exercise her right to choose while fully informed.[6]. These benefits conferred by *804 the ultrasound requirement are secured by the oversight function of the admitting-privileges requirement. Specifically, hospitals extending admitting privileges are given a role in ensuring that the new requirements for the protection of women’s health and choice are observed by abortion doctors — to prevent a substandard abortion care crisis in Wisconsin.
Additionally, many abortion-seeking patients face uniquely challenging circumstances not faced by other surgery patients. Many are young and vulnerable. Some may be pressured by angry, disappointed parents or by a putative father shirking responsibility. And, as the court remarks, there is wide-spread social disapproval of abortion. Maj. Op. at 790. So the woman is likely seeking absolute privacy and has had little or no external consultation or advice. A legislature could rationally speculate that a surgical procedure commonly undergone by young and vulnerable patients under the influence of either direct or social pressures is in greater need of regulation.
In summary, “[t]he State ‘may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.’ ” City of Akron v. Akron Ctr. for Reprod. Health, 462 U.S. 416, 430-31, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (quoting Roe v. Wade, 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)). That is what Wisconsin has done in this case, and its decision to do so by means of an admitting-privileges requirement is certainly rational.
Step 2: Undue Burden
The court also suggests that the admitting-privileges requirement imposes significant burdens on women’s ability to obtain abortions. At this second step, we must determine “whether the [admitting privileges requirement has] the practical effect of imposing an undue burden” on women’s abortion rights. Karlin, 188 F.3d at 481. We cannot find the requirement unconstitutional unless the plaintiffs can show that the requirement “will have the likely effect of preventing a significant number of women for whom the regulation is relevant from obtaining abortions.” Id. In this case, because the requirement applies to all abortion doctors in the state, it affects all Wisconsin women who may seek abortions.[7] See Abbott, 734 F.3d at 414. Therefore, the question is whether the requirement prevents “a significant number of’ women from obtaining abortions. At this step too, the plaintiffs have the burden of proof. See Karlin, 188 F.3d at 485; Bryant, 222 F.3d at 171.
In suggesting that Wisconsin’s admitting-privileges requirement imposes an undue burden, the court emphasizes that it will temporarily force two abortion clinics to stop providing abortions and another clinic to cut the number of doctors by half, which could cause delays for women seeking abortions. Of course, this effect will only last until the doctors at these clinics obtain admitting privileges in accordance with the law.[8] Regardless, more than 70% *805 of women in Wisconsin who seek abortions live in the southern counties near Milwaukee and Madison, where clinics will continue operating. See J.A. 292. Thus, to the extent the remaining clinics are unable to quickly adjust for the decreased supply of legally qualified abortion doctors, most Wisconsin women seeking abortions can travel to clinics in Illinois. Indeed, women living in the northern part of Wisconsin can seek abortions in Minnesota. For example, both Minneapolis and Duluth have abortion clinics.[9] Thus, the admitting-privileges requirement itself will likely not prevent any woman from obtaining an abortion if she wishes to do so. See Bryant, 222 F.3d at 163, 170-72 (holding that “increased costs, delays in the ability to obtain abortions, decreased availability of abortion clinics, [and] increased distances to travel to clinics” do not constitute an undue burden). Any delays are merely the incidental effects of abortion doctors’ obligation to come into compliance with the admitting-privileges requirement. The fact that the requirement “has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.” Casey, 505 U.S. at 874, 112 S.Ct. 2791. And here, we are affirming the district court’s decision to give abortion doctors a reasonable amount of time to obtain admitting privileges.[10]
The court is also concerned by the fact that (because of Wisconsin’s 24-hour waiting law) some Wisconsin women live around 100 miles from the closest abortion clinic — namely, those living in north-eastern Wisconsin — and consequently, will have to traverse that distance four times to obtain abortions (if they cannot afford to spend the night at a local hotel).[11] The court suggests that the time and costs of that travel will prevent a “significant number” of Wisconsin women from obtaining abortions. But the costs of traveling up to 100 miles on four different occasions pale *806 in comparison to the cost of an abortion. The costs of travel are undoubtedly inconvenient, but an inconvenience — even a “severe inconvenience” — “is not an undue burden.” Karlin, 188 F.3d at 481; see also Casey, 505 U.S. at 874, 112 S.Ct. 2791 (“The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.”); Bryant, 222 F.3d at 163, 170-72.
Moreover, in reversing a district court’s decision to preliminarily enjoin Texas’s admitting-privileges requirement, the Fifth Circuit recently held that “[a]n increase in travel distance of less than 150 miles for some women is not an undue burden on abortion rights.” Abbott, 734 F.3d at 415. Texas also imposes a 24-hour waiting requirement (which applies to any woman who lives within 100 miles of the clinic). See Tex. Health & Safety Code § 171.012(a)(4). Thus, under Abbott, Texas women could face an increase in travel distance of almost 400 miles. If an increase in travel distance of almost 400 miles is not an undue burden, it is difficult to see how a total travel distance of about 400 miles could be. See also Bryant, 222 F.3d at 170-71 (finding that admitting-privileges requirement imposed no undue burden where, inter alia, an abortion clinic was still operating “some 70 miles away”); Women’s Med. Prof'l Corp. v. Baird, 438 F.3d 595, 605 (6th Cir.2006) (concluding, in an as-applied challenge to abortion regulation, that an increase in travel distance of 45 to 55 miles is not an undue burden).
In summary, the plaintiffs “have not demonstrated that the [admitting-privileges requirement] would be unconstitutional in a large fraction of relevant cases.” Carhart, 550 U.S. at 167-68, 127 S.Ct. 1610. The other circuits to address this issue have reached the same conclusion. See Abbott, 734 F.3d at 416, 419; Bryant, 222 F.3d at 159, 173.
Conclusion
The decision to have an abortion is, for many women, “the most difficult decision they will ever make.” Lizz Winstead, Abortion Is a Medical Procedure, The Huffington Post, Nov. 11, 2012, http:// www.huffingtonpost.com/lizz-winstead/ abortion-is-a-mediealproeedure_b_2064176. html. Therefore, when a woman enters an abortion clinic, she has a right to expect excellent care from a qualified doctor. One key component of quality care is the use of an ultrasound, which furnishes the abortion doctor with important and easily determinable facts about the pregnancy related to the woman’s health and exercise of her free choice. For example, an ultrasound allows a determination of whether there is a fetal heartbeat, the gestational age and size of the unborn child, and whether there are twins.[12] An ultrasound is also material to the costs of the procedure inasmuch as it may reveal that an abortion is no longer necessary (if the unborn child is no longer alive) and because clinics base the cost of the abortion procedure on the unborn child’s gestational age.
The admitting-privileges requirement has an indisputable benefit when emergency care is needed. If serious complications arise, then the woman should be able to call her clinic and speak with the doctor who treated her. If that physician has admitting privileges, he or she can direct the woman to the hospital and meet her there, or at least contact the hospital and *807 notify the proper admitting personnel to describe the possible causes of the woman’s symptoms. Then, upon arrival at the hospital, the woman would be able to receive immediate care. And, if necessary, the hospital’s doctor could contact the abortion doctor to confidentially obtain further details. Indeed, by requiring abortion doctors to commit to continued care, the admitting-privileges requirement prevents a situation where a hospital doctor is not fully aware of medical concerns because the patient does not wish to disclose that she had an abortion. Relatedly, the ability to obtain any followup care from same doctor furthers a patient’s interest in privacy — a significant concern given the social stigma associated with abortion. Moreover, the admitting-privileges requirement furthers the state’s interest in preventing crises of substandard care. By entrusting hospitals with an oversight function, the requirement guards against worst-case scenarios.
The notion that abortion doctors will be unable to obtain admitting privileges is a fiction. Some already have them.[13] Even sectarian hospitals, apart from their legal duties, are interested in providing compassionate care to women who need it. Some hospitals may not allow elective or discretionary abortions to be performed on their premises, but even these hospitals have every reason to grant admitting privileges to abortion doctors in order to ensure that women in need receive adequate — as well as compassionate — medical care.
At trial, testimony from a technician who routinely performs ultrasounds on pregnant women — those who anticipate and look forward to having a baby as well as those who are considering terminating an unwanted pregnancy — would be beneficial. A neutral technician could explain the value an ultrasound provides for women’s health in order to further illustrate the oversight benefit of the admitting-privileges requirement.
Wisconsin’s admitting-privileges requirement is rationally related to the State’s legitimate interests and should not create an undue burden to Wisconsin women’s right to abortion. But Wisconsin’s failure to include a reasonable time for compliance merited a preliminary injunction. Therefore, I concur in part and concur in the judgment.
Appendix to the Concurrence
Dr. Soleiman Soli in Pennsylvania. See Mark Scolforo, Two Abortion Clinics Closed After Reports, The Washington Times, Mar. 10, 2011, http://www. washingtontimes.com/news/2011/mar/10/2-abortion-clinics-closedafter-reports/ (two abortion clinics shut down when inspection revealed expired drugs, uncalibrated medical equipment, and untrained personnel; a network of abortion care providers described the clinics as “women exploiters”).
Dr. Andrew Rutland in California. See C. Perkes, Abortion Doctor Gives Up License Over Death, Orange County Register, Jan. 25, 2011, http://www.ocregister. com/articles/rutland-285561-death-license. html (woman died where clinic “was not equipped to handle emergencies” and the abortion doctor “failed to recognize [an *808 allergic] reaction, adequately attempt resuscitation or promptly call 911.” The doctor had previously given up his license “after allegations of ... scaring patients into unnecessary hysterectomies, botching surgeries, lying to patients, falsifying medical records, over-prescribing painkillers and having sex with a patient in his office”).
Dr. Albert„ Dworkin in Delaware. See Steven Ertelt, Hearing: Delaware Abortionist Helped Kermit Gosnell Avoid Law, LifeNews, .Mar. 16, 2011, htt p://www. lifenews.com/2011/03/16/hearing-delaware-abortionist-helpedkermit-gosnell-avoid-law/ (doctor complicit in Kermit Gosnell’s violations has license suspended).
Dr. James Pendergraft in Florida. See Steven Ertelt, Abortion Practitioner James Pendergraft Loses Florida License a Fourth Time, LifeNews, Jan. 1, 2009, http://www.lifenews.com/2009/01/01/state-5339/(abortion doctor’s license- suspended for fourth time for entrusting drug administration to unlicensed employee, previous suspensions included a botched abortion that resulted in the unborn child being shoved into the abdominal cavity and requiring that the woman receive a hysterectomy).
The Gentilly Medical Clinic for Women and the Hope Medical Group for Women in Louisiana. See Steven Ertelt, Abortion Business in Louisiana Loses License for Poor Health, Safety Standards, LifeNews, Jan. 20, 2010, http://www.lifenews.com/ 2010/01/20/state-4743/ (clinic lost license for operating without trained nurse or proper drug license); P.J. Smith, Louisiana Abortion Clinic Shut Down for Ignoring “Most Basic” Medical Practices, Life-News, Sep. 7, 2011, http://www. lifesitenews.com/ news/ar-ehive/ldn/2010/sep/10090707 (clinic’s operations suspended for failing to observe “the most basic medical practices” including “provid[ing] women a physical examination prior to abortions” or “follow[ing] necessary protocols for the administration of anesthesia and monitoring their clients’ vital signs”).
Drs. Romeo Ferrer, George Shepard, Leroy Carhart, and Nicola Riley in Maryland. See, respectively, Steven Ertelt, Pro-Lifers Want Maryland Practitioner Disciplined, Killed Woman in Botched Abortion, LifeNews, June 1, 2010, http:// www.lifenews.com/2010/06/01/state-5145/ (“Board of Physician’s Peer .Reviewers concluded the woman’s death resulted from Ferrer’s failure to meet the standard of quality care in violation of state law.”); Steven Ertelt, Troubled Abortion Biz Sees Two Practitioners Lose Medical Licenses, LifeNews, Sept. 3, 2010, http://www. lifenews.com/2010/09/03/state-5416/ (transfer of patient of botched abortion in a rental car to a clinic in another state leads to the discovery, and suspension, of two doctors circumventing state law); Authorities: Woman Died from Abortion Complications, June 12, 2013, http://www. usatoday.com/story/ news/nation/2013/02/21/woman-late-term-abortion-bled-todeath/1935799/ (Dr. Carhart is under investigation for the death of Jennifer Morbelli, a 29 year-old school teacher who underwent a late-term abortion); The order is available at http://abortiondocs.org/ wp-content/uploads/2013/05/ Nicola-Riley-MD-Permanent-Revocation-May-6-2013.-pdf (order permanently revoking Dr. Nicola Riley’s medical license Maryland after she failed to call for emergency help for a critically injured abortion patient and transported her to the hospital in the backseat of a rental car).
Dr. Steven Brigham in Maryland, New Jersey, and Pennsylvania. See N.J. Targets Abortion Doctor Steven Brigham’s Li *809 cense, Lehigh Valley Live, Sept. 9, 2010, http://www.lehighvalleylive. com/phillips-burg/index.ssf/2010/09/nj_tar-gets_abortion_doctor_ste.html (New Jersey seeks to take doctor’s license after Maryland already took his license for risky interstate abortion scheme).
Dr. Rapin Osathanondh in Massachusetts. See Denise Lavoie, Doctor Gets 6 Months in Abortion Patient Death, Associated Press, Sep. 14, 2010, http:/ /www. msnbc.msn.com/id/39177186/ns/us_news-crime_and_courts/V doctor-gets-months-abortion-patientdeath/ (doctor sentenced to six months in jail for involuntary manslaughter because “he failed to monitor [abortion patient] while she was under anesthesia, delayed calling emergency services when her heart stopped, and later lied to try to cover up his actions.”).
Dr. Alberto Hodari in Michigan. See Schuette Files Suit to Close Unlicensed Abortion Clinic, Office of the Attorney General, State of Michigan, Mar. 29, 2011, http://www.michigan.gOv/ag/0,4534,7-164-253426 — , OO.html (Michigan Attorney General sues to close abortion clinic for failing to comply with health and safety rules applicable to surgical outpatient facilities).
Drs. Salomon Epstein and Robert Hosty in New York. See Steven Ertelt, Practitioner Denies He Botched Legal Abortion That Killed Hispanic Woman, LifeNews, Mar. 1, 2010, http://www.lifenews.com/ 2010/03/01/state-4858/ (New York police investigate doctor after 37-year-old patient dies in botched abortion); http:// operationrescue.org/pdfs/Hosty% 20 revocation.pdf (eventually, responsibility for the death Dr. Epstein was investigated for was attributed to another doctor at the clinic, Dr. Hosty, whose license was revoked in this order); Southwestern Women’ Options in New Mexico, see Jeremy Kryn, New 911 Call from New Mexico Abortion Clinic Exposes Pattern of Emergencies, LifeNews, Oct. 20, 2011, http:// www.lifesitenews.com/news/ new-911-call-from-new-mexico-abortion-clinic-exposes-pattern-of-emergencies (“A recording of a 911 call ... highlights the continuing danger [at] an Albuquerque abortion clinic.... The call is the eleventh emergency call [from the clinic] in less than two years.... ” it was transcribed as follows, “ ‘Uh, we have a 31-year-old female who underwent an abortion today. She’s continuing to bleed. We need to transfer her to the hospital, please’.... ‘The bleeding is persistent. It will not stop.’ ”).
Dr. Tami Lynn Holst Thorndike in North Dakota. See Denise Burke, North Dakota Abortionist Practices With Expired License, Americans United for Life, Nov. 8, 2010, http://www.aul.Org/2010/ll/n orth-dakota-abortionist-practices-with-ex-piredlicense/ (“[A] North Dakota abortionist is being investigated for practicing with an expired license.”).
Drs. Robert E. Hanson Jr., Margaret Kini, Douglas Karpen, Pedro J. Kowalysz-yn, Sherwood C. Lynn Jr., Alan Molson, Robert L. Prince, H. Brook Randal, Franz Theard, and William W. West, Jr. of Whole Women’ Health in Texas. See Steven Ertelt, Tenth Texas Abortion Practitioner Under State Investigation, Life-News, Aug. 24, 2011, http://www.lifenews. com/2011/08/24/ tenth-texas-abortion-prac-titioner-under-state-investigation/ (abortion center investigated for “illegal dumping of patient records and medical waste”).
Dr. Thomas Walter Tucker II in Alabama and Mississippi. See Abortion Doctor Suspended for Improper Drug Storage, Orlando Sentinel, Apr. 24, 1994, htt p://articles. orlandosentinel. com/1994-04-24/news/9404240462_l_abortion-doctor-tucker-licensing (Dr. Tucker lost his medi *810 cal license for drug-storage violations, and was subsequently found liable for $10 million in a medical malpractice case involving the death of an abortion patient. See Former Abortion Doctor Ordered to Pay $10 Million, Sun Herald, Dec. 8, 1996, 1996 WLNR 256209).
Dr. Mi Yong Kim in New York and Virginia. See Operation Rescue, Troubled Virginia Abortion Clinic Puts Bleeding Botched Abortion Patient in Hospital, Li-feSiteNews, Apr. 20, 2012, http://www. lifesitenews.com/ news/troubled-virginia-abortion-clinic-putsbleeding-botched-abortion-patient-in/ (patient put in hospital after abortion at clinic run by a doctor whose license had been surrendered. The surrender order available at http:// abortiondocs.org/wp-eontent/uploads/2012/ 04/KimVALicense-Surrender05182007. pdf.).

. See American College of Surgeons, Statement on Patient Safety Principles for Office-based Surgery Utilizing Moderate Sedation/Analgesia, Deep Sedation/Analgesia, or General Anesthesia, Bulletin of the American College of Surgeons, Vol. 89, No. 4 (Apr.2004), available at http://www.facs.org/fellows_info/ statements/st-46.html (last visited on Dec. 12, 2013, as were the other websites cited in this opinion).

. The exact percentage is in dispute, but at least .3% of abortions result in complications requiring hospitalization. In Wisconsin, this amounts to a woman requiring hospitalization as a result of an abortion or attempted abortion every 16 days. As the court recognizes, however, this percentage is likely artificially low due to under-reporting. Maj. Op. at 790. When a woman is admitted to a hospital without a request for admission from an abortion doctor, the social stigmas associated with abortion will likely cause her to report her complications as arising from a miscarriage or other mishap rather than a botched abortion. See also Abbott, 734 F.3d at 412 (quoting Dr. John Thorp regarding “the 'unique nature of an elective pregnancy termination and its likely under-reported morbidity and mortality’ ”); J.A. 183, ¶ 6 & n. 1 (Decl. of Dr. Linn).

. The court expresses doubts about this justification because Wisconsin requires that the hospital be within 30 miles of the clinic at which the doctor performs the abortions. “Under rational basis review, however, the [selected means] need not be the most narrowly tailored means available to achieve the desired end.” Zehner v. Trigg, 133 F.3d 459, 463 (7th Cir.1997); see also American College of Surgeons, supra note 1 (“Physicians performing office-based surgery must have admitting privileges at a nearby hospital, a transfer agreement with another physician who has admitting privileges at a nearby hospital, or maintain an emergency transfer agreement with a nearby hospital.”) (emphasis added); NAP Guide to Good Care (recommending admitting privileges at a hospital "no more than 20 minutes away”).

. Jessica Hopper, Alleged Victim Calls Philadelphia Abortion Doc Kermit Gosnell a 'Monster', ABC News, Jan. 25, 2011, http:// abcnews.go.com/US/all eged-victim-calls-phil-adelphia-abortion-doctorkermit-gosnell/sto-ry?id= 12731387 & singlePage=true

. Detecting a heartbeat enables the abortion doctor to determine whether the unborn child is still alive — a serious concern in light of the prevalence of miscarriages. See National Institute of Health, National Library of Medicine, Miscarriage, http://www.nlm.nih.gov/ medlineplus/ency/arlicle/001488 .htm (“Among women who know they are pregnant, the miscarriage rate is about 15-20%.”). Determining whether there is a beating heart is a crucial component to ensuring that a woman receives quality care. For example, if more than seven weeks have passed since the last menstrual cycle ("LMC”), and there is no fetal heartbeat, then the unborn child is almost certainly naturally deceased- — -although a pregnancy test will continue to generate a positive result. In that situation, the woman must be fully informed about whether an abortion is still necessary because state-subsidized private health insurance and Medicaid — which in most cases do not cover an abortion — will generally cover the procedure for removing the remains. See Wis. Stat. Ann. § 632.8985 (prohibiting coverage of abortions by health plans offered through health benefit exchanges); Wis. Stat. Ann. § 20.927 (prohibiting state or municipal subsidies for the performance of abortions).

.Wisconsin may also hope that a woman who sees the ultrasound picture of her unborn child and hears the heart beating will *804 choose to carry the unborn child to term. But because the ultrasound requirement is not challenged in this case, Wisconsin does not assert its legitimate interest in fetal life here. See Carhart, 550 U.S. at 145, 127 S.Ct. 1610 (recognizing “that the government has a legitimate and substantial interest in preserving and promoting fetal life” pre-viability).

. Thus, the district court erred because it limited its review to women living in the areas near the clinics that may be closed.

. The undue burden analysis is not concerned with any burden the law may place on abortion doctors, except insofar as the law burdens women's ability to obtain abortions. Any burden on women will vanish once abortion doctors obtain admitting privileges.

. The district court thought that the availability of abortions in cities near the Wisconsin border was irrelevant. Although the Wisconsin law does not affect doctors performing abortions in Minnesota, the availability of near-but-out-of-state abortions at least speaks to whether the admitting-privileges requirement has the "practical effect” of preventing a "significant number” of women from obtaining abortions. In our economy, crossing state lines to obtain services at a nearby urban center is common. Thus, state lines are unlikely to affect a woman's decision about where to get an abortion and the availability of abortion at out-of-state clinics should be considered in the undue burden analysis.

. Now that some months have passed, Wisconsin abortion doctors have had sufficient time to come into compliance with the admitting-privileges requirement. The court suggests that disapproval for abortion may interfere with abortion doctors’ abilities to obtain admitting privileges at sectarian hospitals. Maj. Op. at 791-92. However, "Lutheran and Jewish hospitals in Milwaukee allow abortions.” J.A. 185, ¶ 13 (Deck of Dr. James G. Linn). Furthermore, "[w]hile Catholic hospitals do not permit abortions to be performed at their facilities, they do allow abortion providers staff membership.” Id. ("I know for a fact that Catholic hospitals in Milwaukee have or have had abortion providers on their medical staffs.”). Although federal law prohibits sectarian hospitals from discriminating against abortion doctors when awarding admitting privileges, it seems reasonable that — in light of Catholic social teaching — Catholic hospitals would wish to grant admitting privileges to abortion doctors so that women injured by abortions would have better access to the compassionate medical care needed in that delicate circumstance.

.The number of women who seek abortions living in the areas near the closed clinics is apparently very small compared to those living near the clinics that will continue to operate. Thus, the admitting-privileges requirement likely only will compel a few rural women to drive longer distances. So it is far from clear that a "significant number” of women will be prevented from obtaining abortions.

. If the ultrasound reveals twins, this result may cause a woman to reconsider or at least reflect on an unexpected circumstance. In either case, the ultrasound furthers her health and ability to make a fully informed decision.

. According to the plaintiffs, Planned Parenthood’s Milwaukee-Jackson clinic would be able to remain open even if the admitting-privileges requirement went into effect. Thus, at least one abortion doctor at that clinic must have admitting privileges at a nearby hospital. But Affiliated Medical Services’ clinic, which will allegedly close for lack of abortion doctors with admitting privileges, is only 1.3 miles away from Planned Parenthood’s Milwaukee-Jackson clinic. So any claim that abortion doctors at AMS will be unable to obtain admitting privileges because of recalcitrant local hospitals is all but meritless.